UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMY ARTIBEE,

        Plaintiff,                      No. 14-cv-14266

vs.                                              Hon. Gerald E. Rosen

OFFICER CHAD MILLER, in his
individual capacity,

        Defendant.
_____/

OPINION AND ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on November 12, 2015

PRESENT:   Honorable Gerald E. Rosen
                      United States District Chief Judge

I.  INTRODUCTION

This Section 1983 civil rights action is presently before the Court on Defendant's April 10, 2015 Motion for Summary Judgment. Plaintiff has responded to Defendant's Motion and Defendant has replied. Having reviewed and considered the parties' briefs and supporting evidence, the Court has determined that the relevant allegations, facts and legal arguments are adequately presented in these submissions, and that oral argument would not aid the decisional process. Therefore, the Court will decide this matter "on the

briefs." *See* Eastern District of Michigan Local Rule 7.1(f)(2). This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

On October 1, 2013, Flint Township Police Officer Chad Miller, who had more than 15 years law enforcement experience, was on routine patrol when he was dispatched to Bollinger Appraisal and Investment Company, a real estate appraisal and investment firm located on Miller Road in Flint Township, to meet with Mark Bollinger, the owner of the company. Bollinger Appraisal and Investment is a small operation; only Bollinger and his (former) assistant, Plaintiff Amy Artibee, worked in the office. [*See* Plaintiff's Brief, p. 1.] Bollinger had made a complaint that Artibee had embezzled and stole from the company, forged Bollinger's signature on checks, and had downloaded and sabotaged electronically-stored files, and damaged the company's computers. Miller had never met Bollinger prior to meeting him on October 1.

Upon arriving at Bollinger Appraisal and Investment, Officer Miller spoke with Mr. Bollinger about the details of his complaint. According to Bollinger, Artibee had been employed by his company from 2005 until she abruptly resigned on September 4, 2013. Bollinger stated that it was shortly before that date that he discovered irregularities in his books and bank statements, and that on further investigation of company records dating back to January 2012, he subsequently discovered that Artibee had embezzled over $100,000. According to Bollinger, Artibee had taken certain investments, placed

them into an account, and then, based on those investments, wrote checks on which she had forged Bollinger's signature and cashed them at the Dort Federal Credit Union in Grand Blanc, Michigan. Bollinger further told Miller that he also discovered that on September 4, 2013, Artibee's last day at work, she had downloaded confidential company and personal files from his computer and then sabotaged the computer, deleted files, and damaged the company's computer system, all of which resulted in him having to hire a computer technician to restore deleted files and ultimately to replace his entire computer system.

Bollinger told Officer Miller that he wanted to press charges and he provided Miller with copies of the records, bank statements and forged checks evidencing Artibee's fraudulent activities. Miller testified that he accepted as true Bollinger's statement that the signatures on the checks were not his. [Miller Dep., Plaintiff's Ex. 3, p. 10.]

Bollinger also provided Officer Miller with a copy of Artibee's resignation letter, which Bollinger had found when he got to work on September 5, 2013. In that letter, Artibee had stated that she was quitting because she no longer could tolerate the hostile work environment at the company. Among the reasons for her resignation, she listed verbal abuse, sexual harassment, accusations and threats about running the business into the ground, telephone calls from Bollinger during the night, on weekends and when she was on vacation, and his drinking at his desk. Bollinger told Officer Miller that he

believed that Artibee's letter was an "ill-attempt for Amy to hide her embezzlement and fraud." [*See* Police Report, Miller Narrative, Plaintiff's Ex. 2]

After meeting with Bollinger for approximately one hour and ten minutes, Officer Miller returned to the station where he reviewed the documents Bollinger had given him and wrote his report about the meeting. [Miller Dep., pp. 8, 19.]

Miller was off work on October 2nd and 3rd; he returned to work on October 4. On October 4th, Miller further reviewed the documents Bollinger had given him and then he met with Sergeant Salter and notified him of Bollinger's complaint. *Id.* p. 9. Based on what Bollinger had told him and everything Bollinger had given him, Miller had made the determination by the time he met with Sgt. Salter that he had probable cause to arrest Amy Artibee. *Id.*

After discussing the matter with Sgt. Salter, Miller told Salter that he wanted to go out and speak to Amy Artibee and probably arrest her. Sergeant Salter agreed to accompany Miller to make the arrest. As Artibee lived in Clayton Township, they requested a jurisdictional car. Accordingly, jurisdiction officer Lacey Lopez of the Clayton Township Police Department accompanied them.

Miller and Salter arrived at Artibee's residence at approximately 12:20 p.m. on October 4, 2013. [Police Report, p. 3] They were met by Corey Artibee, Plaintiff's husband who informed the officers that Amy was at her mother's house. *Id.* Corey called Amy on her cell phone and handed the phone to Officer Miller. *Id.* Miller told

Amy that he needed to talk to her about Bollinger's complaint, and Amy told him to come to her mother's house. *Id.*

Miller and Slater proceeded to the address that Corey Artibee had given them where they identified Amy Artibee from her driver's license. *Id.* Amy invited Officer Miller into the residence. *Id.* Once inside, Miller told Artibee the nature of Bollinger's complaint and advised her that she was under arrest for embezzlement, fraud, forgery and computer sabotage. *Id.* Artibee told Miller that she was an employee but then invoked her right to remain silent until she had spoken with an attorney. *Id.* Miller then placed Artibee in handcuffs and he and Salter transported her to the Flint Township Police Department for processing. *Id.*

Once at the Police Department, Officer Miller turned Artibee over to Detective Sabo and notified him that Artibee had invoked her right to remain silent until she could speak to an attorney. *Id.* at p. 4. Artibee's attorney arrived on the scene a short while later and met with Detective Sabo before speaking with Artibee. *Id*. Detective Sabo met with Lieutenant Battinkoff and advised that Amy could be processed and then released pending further investigation. *Id.* Miller had no further dealings with Artibee or the Bollinger complaint thereafter. He testified in his deposition that a patrol officer takes an initial complaint, makes a determination as to whether he has probable cause, and makes an arrest. But, "[o]nce that person is either released pending further investigation or disposition is to take them to jail and lodge them, it's pretty much hands off to the patrol

5

officer. At that point it's assigned to a detective -- and they take it from there." [Miller Dep., pp. 11-12.]

Subsequently, Mr. Bollinger was not cooperative with the prosecution of the case and on July 29, 2014, the case against Amy Artibee was closed.

On November 5, 2014, Amy Artibee filed the instant one-count Section 1983 action for violation of her Fourth Amendment rights claiming that Officer Miller arrested her without probable cause as he did not have reasonably trustworthy information that would cause a prudent person to believe that Artibee had committed the crimes that Bollinger accused her of committing.

On April 10, 2015, Defendant Miller filed the instant Motion for Summary Judgment arguing that he is shielded from liability in this action by qualified immunity.

### III. DISCUSSION

A. SUMMARY JUDGMENT STANDARDS

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548,

2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

B.      QUALIFIED IMMUNITY

In civil suits pursuant to 42 U.S.C. § 1983 for money damages, qualified immunity shields public officials who perform discretionary functions from the necessity of defending against tort liability so long as their conduct does not violate clearly established rights of which a reasonable official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982); *Fisher v. Harden*, 398 F.3d 837, 842 (6th Cir. 2005). The doctrine is designed to avoid excessive disruption of government and permit the resolution of many insubstantial claims on a motion to

dismiss or for summary judgment. *Harlow, supra,* 452 U.S. at 818; *Crockett v. Cumberland College*, 316 F.3d 571, 579 (6th Cir. 2003) ("Qualified immunity is intended to serve the public interest by permitting officials to take action with independence and without fear of consequences." *Id.* (citations and internal punctuation omitted).) It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 353, 341 (1986). Qualified immunity is an affirmative defense; once asserted, the "burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity." *Armstrong v. City of Melvindale*, 432 F.3d 695, 699 (6th Cir. 2006) (citing *Sheets v. Mullins*, 287 F.3d 581, 586 (6th cir. 2002)).

Whether qualified immunity applies turns on the "objective legal reasonableness" of the official's action, viewed on a fact-specific, case-by-case basis. *Id.* (citing *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 999 (6th Cir. 1994)). To assess whether a public official is entitled to qualified immunity, the Supreme Court has established a two-part test. *See Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151 (2001). First, the Court must determine whether, considering the facts alleged in a light most favorable to the party injured, a constitutional right has been violated. *Id.*; *Crockett*, 316 F.3d at 579. The second prong of the analysis asks whether the right was so clearly established that a reasonable official would understand that the particular conduct at issue violated that right. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034 (1987); *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005). Courts have discretion

in deciding the order of consideration of these two prongs. *Person v. Callahan*, 129 S.Ct. 808, 818 (2009).

1.     <u>Whether Officer Miller Deprived Amy Artibee of a Constitutional Right</u>

The Court first addresses whether Plaintiff has alleged facts that, viewed in the light most favorable to her, demonstrate that Defendant's conduct violated her constitutional rights. The constitutional right implicated here is the Fourth Amendment right to be arrested only with probable cause. *Crockett*, 316 F.3d at 580. Thus, the Court must determine whether the evidence, when construed most favorably to Artibee, states a claim that Defendant Miller arrested her without probable cause. *See Pyles v. Raisor*, 60 F.3d 1211, 1213 (6th Cir. 1995) (explaining that a § 1983 claim for wrongful arrest turns on whether the officer had probable cause under the Fourth Amendment); *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir.2002) ("In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause."(citing *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir.1999)).).

The Fourth Amendment of the United States Constitution guarantees that "[t]he right of people to be secure in their persons. . . against unreasonable seizures. . . shall not be violated." U.S. Const., amend. IV. "Today it is well established that any arrest without probable cause violates the Fourth Amendment." *Crockett*, 316 F.3d at 580; *see also Klein v. Long*, 275 F.3d 544, 549 (6th Cir. 2001); *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000); *Ahlers v. Scheibl*, 188 F.3d 365, 370 (6th Cir. 1999); *cf., Baker*

9

*v. McCollan*, 443 U.S. 137, 142-43, 99 S.Ct. 2689 (1979) ("By virtue of its 'incorporation' into the Fourteenth Amendment, the Fourth Amendment requires the States to provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty." (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975)).

For a police officer to have probable cause for arrest, there must be "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *see also Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Fridley*, 291 F.3d at 872; *Klein*, 275 F.3d at 550; *Donovan v. Thames*, 105 F.3d 291, 298 (6th Cir. 1997). "Probable cause requires only the probability of criminal activity not some type of '*prima facie*' showing." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir.1988); *see also United States v. Strickland*, 144 F.3d 412, 415 (6th Cir.1998) ("The Fourth Amendment, after all, necessitates an inquiry into probabilities, not certainty.").

The probability of criminal activity is assessed under a reasonableness standard based on "an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." *Crockett*, 316 F.3d at 580 (quoting *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir.1999)); *see also Hunter v. Bryant*, 502 U.S. 224, 228, 112

S.Ct. 534, 116 L.Ed.2d 589 (1991) ("[T]he court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed ... after the fact."); *Klein*, 275 F.3d at 550 ("Probable cause is assessed 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight [.]' "); *Gardenhire*, 205 F.3d at 315; *Strickland*, 144 F.3d at 415 ("[T]he Fourth Amendment does not require that a police officer know a crime occurred at the time the officer arrests or searches a suspect.").

Once an officer establishes probable cause, he or she is under no obligation to continue investigating and may instead pursue the arrest of a suspect. *Crockett*, 316 F.3d at 580; *Klein*, 275 F.3d at 551 ("[O]nce a police officer has sufficient probable cause to arrest, he need not investigate further."); *Ahlers*, 188 F.3d at 371 ("Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused."); *Criss*, 867 F.2d at 263 ("A policeman, however, is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause.").

In this case, Officer Miller relied upon the statement of the victim of the crime, Mr. Bollinger, and the documents Bollinger provided Miller, to establish probable cause. Bollinger told Miller that Amy Artibee had embezzled funds, forged checks and

11

damaged his computers. Additionally, Bollinger produced documentation supporting his complaint which included bank records and checks identified by Bollinger as having been signed by Artibee using his name, without authorization. Bollinger pointed out the pertinent evidence contained in these documents to Officer Miller. No one else worked in Bollinger's office besides Bollinger and Artibee. *See* Plaintiff's Brief, p. 1.

The Sixth Circuit has held that "statements of victims and eyewitnesses of crimes are entitled to a presumption of reliability and veracity without independent corroboration." *United States v. Ingram*, 985 F.2d 562 (6th Cir.1993). *See also Ahlers v. Schebil*, *supra*, 188 F.3d at 370 (A victim's eyewitness statements "based on firsthand observations . . . are generally entitled to a presumption of reliability and veracity," and law enforcement officers are "entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest."); *Peet v. City of Detroit*, 502 F.3d 557, 564-65 (6th Cir. 2007); *Franklin v. Miami University*, 214 F. App'x 509, 512 (6th Cir. 2007).

Accordingly, when probable cause is established from a statement by a victim or an eyewitness, the individual attacking probable cause must provide evidence that the law enforcement officers had reason to believe the testimony of the witness was untruthful or unreliable. *Molnar v. Care House*, 574 F. Supp. 2d 772,792 (E.D. Mich. 2008), *aff'd*, 359 F. App'x 623 (6th Cir. 2009), *cert. denied*, 562 U.S. 839 (2010); *see also Ahlers, supra*.

In *Ahlers*, a female prisoner accused a police officer of sexual misconduct. The investigating officers relied on the alleged victim's testimony to establish probable cause and obtained a warrant to arrest Officer Ahlers. After charges were dropped, Ahlers sought damages under 42 U.S.C. § 1983 and argued that he had been charged and arrested without sufficient probable cause. *Id*. at 369. In that case, the court found that law enforcement officers may properly rely on firsthand testimony from a victim to establish probable cause. The court stated that Ahlers was required to provide evidence that the defendants had reason to believe the victim's testimony was untruthful or unreliable in order to sustain a claim that there were genuine issues of fact regarding the existence of probable cause. *Id*. at 370–371 ("An eyewitness identification will constitute sufficient probable cause unless, *at the time of the arrest*, there is an apparent reason for the officer to believe that the eyewitness was lying, [or] did not accurately describe what he had seen ....") (internal quotations omitted; emphasis added). Because Ahlers submitted no evidence to support a claim that the victim's testimony was untruthful or unreliable, the court found that there was probable cause. *Id*. at 371.

The same is true in this case. Although Plaintiff attempts to demonstrate unreliability by pointing to Bollinger's indebtedness, alcohol and substance abuse, and the complaints Amy Artibee made in her resignation letter, she has failed to establish that this was information of which Officer Miller was aware at the time of Artibee's arrest. Officer Miller testified that he had never even met Bollinger prior to taking is complaint

13

on October 1, 2013. He further testified that he knew nothing of Bollinger's indebtedness, alcohol or substance abuse, his marital status, the condition of his business or anything else about him. As set forth above, the probable cause determination turns on what a reasonable officer would conclude *based on the facts and circumstances known to him at the time of the arrest*. The Sixth Circuit has repeatedly admonished courts to "assess the existence of probable cause from the perspective of a reasonable officer *on the scene*, rather than with the 20/20 vision of hindsight." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir.2005) (citations omitted).

Plaintiff appears to be arguing that had Officer Miller investigated the allegations she made in her resignation letter he would have determined that Bollinger had a reason to fabricate his complaint about her forging his signature and embezzling funds, thereby negating the probable cause determination. Plaintiff, however, ignores that "[o]nce a law enforcement officer has "probable cause" he is under no duty to continue the investigation to determine whether exculpatory evidence existed, *and is under no obligation to investigate, or give credence to, a suspect's story or alibi*." *Molnar v. Care House*, 574 F. Supp. 2d at 793 (citing *Ahlers*, 188 F.3d at 371). *See also Logsdon v. Hains*, 492 F.3d 334 (6th Cir. 2007) ("After a law enforcement officer determines, on the basis of the facts and circumstances known to him, that probable cause exists to support an arrest, the officer has no further duty to investigate or to search for exculpatory evidence.").

The question for a court reviewing a question of probable cause is not whether the law enforcement officers conducted a thorough investigation, but whether the totality of evidence actually in the possession of the officers would lead an objectively reasonable officer to conclude the individual committed a crime. *Molnar* at 794. Moreover, the mere fact an investigation is not "thorough" does not mean that an individual's constitutional rights have been violated. *Id.*

In sum, the Court concludes that Plaintiff has failed to carry her burden of showing that, at the time of the arrest, Officer Miller had reason to believe that Mark Bollinger, or any of the evidence he provided the officer, was untruthful or unreliable. Based upon the statements and evidence Bollinger supplied, Officer Miller had probable cause to arrest Amy Artibee on October 4, 2013. Because there was probable cause for Artibee's arrest, there was no constitutional violation. Therefore, there is no need for the Court to analyze the second prong of the qualified immunity test. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

## IV. CONCLUSION

For all of the reasons set forth above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment **[Dkt. # 9]** is GRANTED. Accordingly,

IT IS FURTHER ORDERED that Plaintiff's Complaint be, and hereby is, DISMISSED, in its entirety, with prejudice..

Let Judgment be entered accordingly.


       s/Gerald E. Rosen
       Chief Judge, United States District Court

Dated: November 12, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 12, 2015, by electronic and/or ordinary mail.

       s/Julie Owens
       Case Manager, (313) 234-5135